**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
MONA T. KANCIPER,

                    Plaintiff,

             -against-

SUFFOLK COUNTY SOCIETY FOR THE
PREVENTION OF CRUELTY TO ANIMALS,
INC., ROY GROSS, GERALD LAUBER,
SHAWN A. DUNN, MICHAEL NORKELUN,
JOHN AND JANE DOES 1-10,

                   Defendants.
--------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
12-CV-2104 (ADS)(ARL)

<u>**APPEARANCES:**</u>

**McLaughlin & Stern**
*Attorneys for the Plaintiff*
260 Madison Avenue
New York, NY 10016
      By: Alan Edward Sash, Esq.,
          Steven Jay Hyman, Esq., Of Counsel

**Gordon & Rees, LLP**
*Attorneys for the Defendants*
90 Broad Street, 23rd Floor
New York, NY 10004
      By: Brian Maurice Oubre, Esq.,
          Joseph Salvo, Esq.,
          Mercedes Colwin, Esq., Of Counsel

**SPATT, District Judge**.

      The Plaintiff Mona T. Kanciper (the "Plaintiff" or "Kanciper") commenced this civil

rights action on April 30, 2012, pursuant to 42 U.S.C. § 1983, *et seq.* ("Section 1983"), as well as

Article IV, Section 1 of the New York State Constitution and Section 30 of the New York State

Executive Law, stemming from the execution of a search warrant on her property by the agents

of the Defendant, the Suffolk County Society for the Prevention of Cruelty to Animals Inc.

1

("SPCA"), and her subsequent arrest and prosecution. Further, the Plaintiff seeks a declaratory judgment that New York State Criminal Procedure Law §2.10(7)—a statute pertaining to the peace officer status of the SPCA's agents—is unconstitutional both on its face and as applied. Presently pending before the Court is the Defendants' motion to dismiss and the Plaintiff's motion to amend her complaint. For the reasons set forth below, the Court grants the Defendants' motion to dismiss this action and thus need not address the Plaintiff's motion to amend.

## I. BACKGROUND

The following facts are drawn from the complaint and construed in a light most favorable to the Plaintiff. As another district judge aptly phrased it, "[t]his case, brought under the Fourth Amendment, involves the need to reconcile human rights with the obligation to protect other species from harm caused by human activity." Suss v. Am. Soc. For Prevention of Cruelty to Animals, 823 F. Supp. 181, 184 (S.D.N.Y. 1993).

The Defendant the Suffolk County Society for the Prevention of Cruelty to Animals, Inc. ("SPCA") is a not-for-profit corporation organized and existing under the laws of the State of New York. The SPCA is governed by a six person Board of Directors: the Defendant Roy Gross (the Executive Director and Chief), his wife Lois Gross, Alex Parathyrus, Herbert Kellner, the Defendant Gerald Lauber (Chief of Detectives), and William Wexler. The Plaintiff alleges that the SPCA has approximately 30 individuals who have been given Peace Officer status and are part-time agents. The Defendants Michael Norkelun and Shawn A. Dunn are "detectives" with the SPCA and in doing so, investigate, prosecute, and enforce alleged violations of the New York State Penal Law and the Agriculture and Markets Law.

The SPCA was formed in or about 1983 pursuant to the New York State Not-For-Profit Corporation Law, § 1403, which authorizes one corporation per county whose purpose is the prevention of cruelty to animals. See N.Y. NPC Law § 1403(a)(1) ("A corporation for the prevention of cruelty to animals shall not hereafter be incorporated for the purpose of conducting its operations . . . in any other county if thereby two or more such corporations would exist in such county . . ."). It has no oversight by any governmental body or official. Nevertheless, the SPCA is empowered under Criminal Procedure Law § 2.10(7) to grant its employees or agents "peace officer status", which in turn, empowers these individuals to search and arrest, carry a weapon, and act to enforce the laws of the State of New York in the same manner as governmental employees.

The Defendants Lauber, Dunn and Norkelun are such peace officers. In order to qualify as a peace officer, an individual must complete a short training course sponsored by the New York State Division of Criminal Justice. However, appointed peace officers take no oath of office; they do not report to any public official; and they are not under the auspices or control of any public agency. They are accountable only to the Board of Directors of the SPCA. The peace officers are assigned to one division of the SPCA—the "Law Enforcement Division"—as opposed to the "Humane Division", which focuses on pet clinics and programs.

Prior to August 2009, SPCA issued badges to its peace officers. According to the Plaintiff, these badges bear a virtual copy of the New York State Device of Arms and are embossed with the public officer title of "Detective", in violation of New York General Business Law § 136. The SPCA also issues its peace officers shield numbers, patches, epaulettes, and uniforms. In addition, they issue public officer titles to allegedly give the appearance of police officer status, such as "Officer", "Detective", "Chief", "Sergeant", and "Lieutenant".

Kanciper owns and resides on a 50-acre horse farm in Manorville, New York, which is located in Suffolk County. This horse farm is the location of a corporation called The New York Horse Rescue Corporation, which rescues discarded and unwanted horses. According to the Plaintiff, since 1998, her horse farm has rescued more than 1,500 horses, many of whom were bound for auction kill buyers. These horses were then either adopted by families or lived the remainder of their lives on the horse farm, sometimes being used to provide horseback riding lessons. Kanicper's husband, who is now deceased, was the farm's resident veterinarian. The Plaintiff's two children also live on the property.

On or about August 5, 2009, a woman called SPCA to make a complaint regarding "equine abuse" at the horse farm. The Plaintiff claims that this complaint was outrageous and untrue, and was made only because the complainant had a personal vendetta against her. Regardless, the SPCA assigned a case number to the complaint and referred it to Defendant Dunn for investigation. According to the Complaint, Dunn went to the Plaintiff's horse farm unannounced on August 18, 2009 at approximately 1:30pm. He knocked on the front door. The Plaintiff's husband answered, and Dunn announced that he was a "detective" and there to investigate a complaint about horse abuse. Kanciper's husband, who was frail and mentally impaired due to past injuries, told Dunn to come back when Kanciper was home. However, the Complaint states that Dunn nevertheless intimidated and threatened him, saying that he would lose his veterinary license if he did not cooperate. After repeatedly telling Dunn to leave because he was ill, Dunn eventually left the residence.

On August 28, 2009, Dunn once again visited the Plaintiff's horse farm. On this date, Kanciper and her children were outside the residence. Dunn allegedly approached Kanciper and her children, revealing that he was wearing a firearm and displaying an SPCA "badge" on a

chain around his neck.  He introduced himself as "detective".  The Plaintiff claims that she told

Dunn to leave the premises and that if he had any questions, he should contact her lawyer, to

which Dunn responded, "if you have an attorney, you must be guilty."  (Compl., ¶ 56.)

Eventually, Dunn left the premises and threatened "We'll see about this."  He also called the

Kanciper home on November 16, 2009.  Dunn eventually closed the case file against Kanciper in

December 2009, finding no probable cause that Kanciper or her husband was abusing horses or

any other animal.

On December 23, 2009, another woman with a supposed personal vendetta against the

Plaintiff called SPCA to allege that Kanciper was abusing horses.  Once again, SPCA assigned a

case number to the complaint, this time assigning the case to Defendant Norkelun.  On Christmas

Day, December 25, 2009, Norkelun made an unannounced visit to the horse farm to question

Kanciper at approximately 12:50pm.  He drove a vehicle with SPCA markings all over it, which

the Plaintiff alleges had the appearance of a police car.  He called the Plaintiff's house phone

from his car and informed her that he was a "detective" waiting to speak with her about a

starving horse.  The Plaintiff states that she informed Norkelun that there was no starving horse,

but Norkelun nevertheless requested permission to walk around the residence.  Due to his

persistence, Kanciper proceeded to walk Norkelun around the property, despite the fact that it

was Christmas Day and her husband had recently passed away.  At the conclusion of this tour,

Norkelun told the Plaintiff that while he could not tell her who was making the complaints, he

was familiar with the farm and knew that all the horses were fine.  In his official report, he wrote

that Kanciper "did show this officer several horses inside a large barn that appeared healthy."

(Compl., ¶ 81.)

Nonetheless, four days later, on December 28, 2009, Norkelun visited the home of the complainant to collect written statements. However, as to the Plaintiff, he did not interview any of the employees or tenants of her house farm, nor did he make firsthand observations. Instead, Norkelun concluded based upon the complainant's statements, that Kanciper had euthanized dogs and horses by herself without a veterinarian present. The Plaintiff alleges that these sources should not have been utilized, because the complainants' statements were riddled with hearsay and driven by a motivation to fabricate.

Between January 2010 and March 2010, the SPCA, including Gross, Lauber, Norkelun and Dunn, apparently made no efforts to corroborate, verify, or otherwise obtain firsthand accounts of the allegations made against Kanciper. Instead, they considered only the complainants' statements and prepared an application for a search warrant. Accordingly, on March 18, 2010, Norkelun applied for a search warrant pursuant to N.Y. CPLR § 690 from a local district court on behalf of the SPCA. He submitted an affidavit in support of the application, which stated that he was a detective and that the source of the relevant information was his personal knowledge. He did not include information indicating that Kanciper showed him several horses that appeared healthy. In addition, Norkleun apparently also included allegations that Kanciper had endangered the welfare of a child. The Plaintiff alleges that the request for a search warrant was in violation of Criminal Procedure Law § 690 because as a "peace officer", Norkelun was not authorized to request a search warrant, and that because the search warrant was based upon allegations of the Penal Law (endangering the welfare of a child), it was for matters outside of his role for prevention of cruelty to animals.

On March 20, 2010, Norkulen, Lauber and eight other members of the SPCA arrived unannounced at the horse farm to execute the search warrant. At 9:25am, four employees from

the Suffolk County Department of Public Works, with heavy digging machinery, also arrived at the horse farm. The machinery was used to dig up large portions of Kanciper's property without her consent. In addition, agents of the SPCA restrained Kanciper's movement without her consent and did not let her leave the horse farm while the search warrant was being executed, despite the absence of an arrest warrant. They also are alleged to have ruthlessly interrogated her during the search, despite her request to speak with counsel. Kanciper was not read her <u>Miranda</u> rights by the SPCA agents until 4:00pm, which was approximately eight hours after the search began.

The SPCA searched the horse farm for a total of ten hours. They also alerted a news crew from News 12 television about the search warrant so that a news van, cameraman, and reporter were present at the horse farm during the search.

During the execution of the first search, Norkelun requested a second warrant to search the Plaintiff's home. Once it was obtained, he returned to her premises, entered her home, and allegedly seized her personal property.

In July 2010, a grand jury indicted the Plaintiff on three counts of animal cruelty solely with regard to dogs, not horses, and two counts of endangerment of a minor. The Plaintiff subsequently surrendered to the 7th Precinct where Norkelun was waiting for her. He handcuffed her to a desk for several hours while processing her. However, the 7th Precinct and the Suffolk County Police Department were not involved with the investigation or arrest of the Plaintiff. Eventually Kanciper went to trial on the five counts against her. Ultimately, on October 13, 2011, the court dismissed one charge and found Kanciper not guilty on all of the other charges except one, endangerment of a child. This count was based upon allegations that Kanciper, in front of a 10-year-old, injected a dog who was dangerous and aggressive with a

tranquilizer. As the Plaintiff points out in the Complaint, there were no counts sustained against her related to animal cruelty, which are the only laws that SPCA is permitted to enforce. The endangerment of a child charge was being appealed at the time that the Complaint was filed. However, on November 14, 2012, a unanimous panel of the New York Appellate Division, Second Judicial Department, reversed that conviction, holding that the evidence failed to establish that witnessing the injection of the tranquilizer was likely to result in harm to the physical, mental, or moral welfare of the child. See New York v. Mona Kanciper, 2012 N.Y. Slip Op. 07695 (App. Div. 2012). Accordingly, the Plaintiff has been exonerated on all charges brought against her by the Defendants.

Meanwhile, on February 4, 2011, while the criminal case was still pending, Kanciper brought suit in New York State Supreme Court, County of Suffolk, against the SPCA and other individuals, titled New York Horse Rescue Corporation, M. Butler Farm, LLC and Mona T. Kanciper v. Suffolk County Society for the Prevention of Cruelty to Animals, Roy Gross, Michael Norkelun, Ann Marie Fergo, Emily Holder, and Ann Collins Studer, Index No. 4263/2011 (the "Suffolk County Action"). In this action, which appears to still be pending, the Plaintiff seeks civil damages from SPCA with regard to their alleged abuse of process; negligent investigation of witness complaints and in the obtaining and execution of search warrants; tortious interference with prospective business relations; fraud and misrepresentation; negligent misrepresentation; and intentional infliction of emotional distress. (See Oubre Decl., Ex. E.)

Further, on February 1, 2012, the Plaintiff also initiated a currently pending Article 78 Petition in New York State Supreme Court, Suffolk County, Index No. 3473/2012, to declare the SPCA a "public entity" pursuant to New York State law, and therefore subject to the Freedom of Information Law ("FOIL"). (See Oubre Decl., Ex. F.)

Kanciper then initiated the present lawsuit on April 30, 2012. In this case, the Plaintiff brought several causes of action against the Defendants. First, she brought a cause of action for a declaratory judgment and a permanent injunction, asserting that N.Y. Criminal Procedure Law §2.10(7) is unconstitutional, because it unlawfully delegates to a private advocacy group police powers to investigate, search, seize, and arrest individual citizens of the United States in derogation of the Fourth and Fifth Amendments. Second, she brought a cause of action for violations of 42 U.S.C. § 1983, alleging that the Defendants acting under color of state law subjected Kanciper to a deprivation of her constitutional rights by exceeding their authority; conducting an illegal search of her home and property; unlawfully restraining her; improperly applying for an executing a search warrant; unlawfully interrogating her; and depriving her of the right to counsel. Third, she brought a cause of action for violations of the New York State Constitution, Article IV, Section I, and New York State Executive Law §30.

The Plaintiff asserts that the legal issues in the Suffolk County Action have nothing to do with civil rights or the constitutionality of Criminal Procedure Law § 2.10(7)—which is the gravamen of Kanciper's complaint against the SPCA Defendants in this lawsuit. She also contends that the sole legal issue in the Article 78 proceeding—whether SPCA is subject to FOIL—is wholly independent from the question of whether the Defendants violated Kanciper's civil rights or whether Criminal Procedure Law § 2.10(7) is unconstitutional.

## II. DISCUSSION

### A.  Legal Standards

#### 1. Motion Pursuant to Fed. R. Civ. P. 12(c)

In general, "the standard for addressing a Rule 12(c) motion for judgment on the pleadings is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim." Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).

Under the now well-established Twombly standard, a complaint should be dismissed only if it does not contain enough allegations of fact to state a claim for relief that is "plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, 570 (2007).  The Second Circuit has explained that, after Twombly, the Court's inquiry under Rule 12(b)(6) is guided by two principles.  Harris v. Mills, 572 F.3d 66 (2d Cir. 2009) (citing Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)).

"First, although 'a court must accept as true all of the allegations contained in a complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'"  Id. at 72 (quoting Iqbal, 129 S. Ct. at 1949).  "'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss' and '[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. (quoting Iqbal, 129 S. Ct. at 1950).  Thus, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and . . . determine whether they plausibly give rise to an entitlement of relief."  Iqbal, 129 S. Ct. at 1950.

In considering a motion to dismiss, this Court accepts as true the factual allegations set forth in the complaint and draws all reasonable inferences in the Plaintiff's favor.  Zinermon v.

Burch, 494 U.S. 113, 118, 110 S. Ct. 975, 979, 108 L. Ed. 2d 100 (1990); In re NYSE Specialists Secs. Litig., 503 F.3d 89, 91 (2d Cir. 2007).  Only if this Court is satisfied that "the complaint cannot state any set of facts that would entitle the plaintiff to relief will it grant dismissal pursuant to Rule 12(b)(6)".  Hertz Corp. v. City of N.Y., 1 F.3d 121, 125 (2d Cir. 1993).  The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)).

### 2. Motion to Amend

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, a party may amend its pleading by leave of court and leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a); see also Monahan v. N.Y. City Dep't. of Corr., 214 F.3d 275, 283 (2d Cir. 2000) (citing Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962)). Generally, amendments are favored because they "tend to facilitate a proper decision on the merits."  Sokolski v. Trans Union Corp., 178 F.R.D. 393, 396 (E.D.N.Y. 1998) (internal quotation marks and citations omitted).

Where, as here, a proposed amendment adds new parties, the propriety of amendment is governed by Fed. R. Civ. P. 21, which provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party."  Fed. R. Civ. P. 21; see Garcia v. Pancho Villa's of Huntington Vill., Inc., 268 F.R.D. 160, 165 (E.D.N.Y. 2010) (citing Duling v. Gristede's Operating Corp., 265 F.R.D. 91 (S.D.N.Y. 2010)); see also City of Syracuse v. Onondaga Cty., 464 F.3d 297, 308 (2d Cir. 2006) ("Although Rule 21 'contains no restrictions on when motions to add or drop parties must be made, the timing of the motion may influence the court's

discretion in determining to grant it.  Thus, the court typically will deny a request that comes so late in the litigation that it will delay the case or prejudice any of the parties to the action.") (quoting 7 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, Civil 3d § 1688.1 at 510 (West 2001)).  Rule 21 grants the court broad discretion to permit the addition of a party at any stage in the litigation.  Sullivan v. West New York Res., Inc., No. 01 Civ. 7847, 2003 WL 21056888, at * 1 (E.D.N.Y. Mar. 5, 2003).

In deciding whether to permit the addition of defendants, courts apply the "same standard of liberality afforded to motions to amend pleadings under Rule 15."  Soler v. G & U, Inc., 86 F.R.D. 524, 528 (S.D.N.Y. 1980) (quoting Fair Hous. Dev. Fund Corp. v. Burke, 55 F.R.D. 414, 419 (E.D.N.Y.1972)).  Thus, leave to amend a complaint to assert claims against additional defendants "should be denied only because of undue delay, bad faith, futility, or prejudice to the non-moving party, and the decision to grant or deny a motion to amend rests within the sound discretion of the district court."  DeFazio v. Wallis, No. 05 Civ. 5712, 2006 WL 4005577, at * 1 (E.D.N.Y. Dec. 9, 2006) (citing Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 603–04 (2d Cir. 2005); Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995)).

## B.  As to the Defendants' Motion to Dismiss Based on Abstention

The Defendants raise several arguments as to why this Court should dismiss this action in light of the parallel state court proceedings.  Many of these arguments relate to various abstention doctrines that have been developed over time by the federal courts.  The Defendants have also raised the issue of "claim splitting", which is not an abstention doctrine but rather more accurately categorized as a variation of the *res judicata* doctrine.  The Court will first explore the various potential grounds for abstention and then will address the Defendants' claim splitting argument in a separate section below.

The Supreme Court has acknowledged four extraordinary and narrow exceptions to the duty to exercise jurisdiction. First, a federal court may abstain to avoid deciding a constitutional issue which may be disposed of by a state court ruling on state law. See Railroad Comm'n of Tex. v. Pullman Co., 312 U.S. 496, 61 S. Ct. 643, 85 L. Ed. 971 (1941). Second, abstention is appropriate in cases involving complex questions of state law which implicate important state policy issues. See Burford v. Sun Oil Co., 319 U.S. 315, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943). Third, a federal court must abstain in cases filed to enjoin state enforcement proceedings absent a showing of bad faith, harassment, or other unusual circumstance calling for equitable relief. See Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971). Fourth, abstention is permissible "for reasons of wise judicial administration" when parallel state court proceedings are pending. See Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 818, 96 S. Ct. 1236, 1246, 47 L. Ed. 2d 483 (1976); Wilton v. Seven Falls Co., 515 U.S. 277, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995). "The various types of abstention are not rigid pigeonholes into which federal courts must try to fit cases. Rather, they reflect a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes." Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 11 n. 9, 107 S. Ct. 1519, 1527 n.9, 95 L. Ed. 2d 1 (1987).

Putting aside the notion of claim splitting, which the Court will address below, the Defendants claim that the Court should abstain from the instant action on three of the four above mentioned grounds. The Court will first discuss Burford abstention, and then go on to assess the alternative two potential bases for abstention.

**1. <u>Burford</u> Abstention**

First, the Defendants assert that the Court has ample ground to abstain from adjudicating the instant action because the parallel Suffolk County Action and pending Article 78 Petition can provide the same relief to the Plaintiff, and because the state-law based claims are better adjudicated by the state court. Specifically, the Defendants have moved this Court to abstain pursuant to a principle enunciated by the Supreme Court known as the "<u>Burford</u> abstention." This doctrine instructs a federal court to abstain, as follows:

> [w]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

<u>New Orleans Pub. Serv., Inc. v. Council of New Orleans ("NOPSI")</u>, 491 U.S. 350, 361, 109 S. Ct. 2506, 105 L. Ed. 2d 298 (1989) (citations and quotations omitted); <u>see Tribune Co. v. Abiola</u>, 66 F.3d 12 (2d Cir. 1995).

The <u>Burford</u> abstention doctrine is applied by federal courts in order to avoid unnecessary conflict with a state's administration of its own affairs. <u>See Weiser v. Koch</u>, 632 F. Supp. 1369, 1384 (S.D.N.Y. 1986). As opposed to another type of abstention— <u>Colorado River</u> abstention (<u>see Colorado River Water Conservation District v. United States</u>, 424 U.S. 800, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976))—the purpose of which is to ease the congestion of the federal court docket when a similar action is pending in state court, the goal of <u>Burford</u> abstention is to avoid needless disruption of state efforts to establish a coherent policy in an area of comprehensive state regulation.

There are "three factors to consider in connection with the determination of whether federal court review would work a disruption of a state's purpose to establish a coherent public policy on a matter involving substantial concern to the public." Libery Mut. Ins. Co. v. Hurlbut, 585 F.3d 639, 650 (2d Cir. 2009). Those factors are as follows: "(1) the degree of specificity of the state regulatory scheme; (2) the need to give one or another debatable construction to a state statute; and (3) whether the subject matter of the litigation is traditionally one of state concern." Hachamovitch v. DeBuono, 159 F.3d 687, 697 (2d Cir. 1998). When determining whether Burford abstention or dismissal is appropriate, a federal court must make an "equitable decision balanc[ing] the strong federal interest in having certain classes of cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining uniformity in the treatment of an essentially local problem, and retaining local control over difficult questions of state law bearing on policy problems of substantial public import." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 728, 116 S. Ct. 1712, 135 L. Ed. 2d 1 (1996) (citations and internal quotation marks omitted). "This balance only rarely favors abstention, and the power to dismiss recognized in Burford represents an 'extraordinary and narrow exception to the duty of the District Court to adjudicate a controversy properly before it.'" Id. (quoting Colo. River, 424 U.S. at 813, 96 S. Ct. 1236).

A court has three options when it decides to refrain from the action under the Burford abstention doctrine. The court may dismiss the action, remand the action to state court if it was commenced there, or stay the action. See id. at 721, 116 S. Ct. 1712, 135 L. Ed. 2d 1. The Supreme Court has held that "an order merely staying the action 'does not constitute abnegation of judicial duty. On the contrary, it is a wise and productive discharge of it. There is only

postponement of decision for its best fruition.'" Id. (quoting Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25, 29, 79 S. Ct. 1070, 3 L. Ed. 2d 1058 (1959)).

Here, the Defendants argue that the Plaintiff is seeking a determination that a New York State statute is unconstitutional pursuant to both the federal and New York State constitutions. Thus, the Defendants assert that the question of the constitutionality of a New York State statute is better placed in the New York State court system. On the other hand, the Plaintiff argues that there is no public policy or comprehensive regulations at issue in this case. Rather, she states that her Section 1983 claim only seeks, in part, to hold a state statute unconstitutional.

The Court agrees with the Plaintiff that Burford abstention is inapplicable here. A number of United States Supreme Court cases have "illustrated the narrow range of circumstances in which Burford can justify the dismissal of a federal action." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 726, 116 S. Ct. 1712, 135 L. Ed. 2d 1 (1996).

The first factor—the degree of specificity of a state regulatory scheme— "focuses more on the extent to which the federal claim requires the federal court to *meddle* in a complex state scheme." Id. (emphasis in original). Here, the Plaintiff's federal claims would not require this Court to meddle in a complex statutory scheme. Instead, the Plaintiff's Section 1983 and declaratory judgment claims seek a determination that the statutory scheme and the SPCA's actions violate the Constitution. Burford "does not require abstention whenever there exists . . . a [complex state administrative process] or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." NOPSI, 491 U.S. at 362, 109 S. Ct. 2506. While Burford should be utilized as a prevention tool to stop the interference with processes of state government, "there is . . . no doctrine requiring abstention merely because resolution of a federal

question may result in the overturning of a state policy.'" Id., 491 U.S. at 363, 109 S. Ct. 2506

(quoting Zablocki v. Redhail, 434 U.S. 374, 380 n.5, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978)).

As for the second factor—the debatable interpretation of a state statute—this factor does

weigh in the other direction. The Plaintiff does not merely seek a determination that the SPCA

applied the relevant state statute unconstitutionally. She also seeks a determination that a state

statute is facially unconstitutional. This could arguably "put the federal court into the business of

interpreting the state regulatory regime." Hachamovitch, 159 F.3d at 698."

Finally, with regard to the third factor—whether the subject matter of the litigation is

traditionally one of state concern—it is undeniable that the constitutionality of a state criminal

procedure law is a matter of extreme importance to the State. This is especially so when state

constitutionality as well as federal constitutionality is at issue. On the other hand, Burford

abstention is not required "even in cases where the state has a substantial interest if the state's

regulations violate the federal constitution." Hachamovitch, 159 F.3d at 698.

Therefore, although it is a close issue, the Court finds that Burford is inapplicable to the

instant case. The Defendants' motion to dismiss on this ground is denied.

## 2. **Pullman** Abstention

Pullman abstention prohibits federal courts from resolving a federal constitutional issue

when a state court's clarification of an ambiguous state law might make the federal court's

constitutional ruling unnecessary. See R.R. Comm'n of Texas v. Pullman Co., 312 U.S. 496, 61

S. Ct. 643, 85 L. Ed. 971 (1941). In other words, "[t]he Pullman doctrine requires that 'federal

courts should abstain from decision when difficult and unsettled questions of state law must be

resolved before a substantial federal constitutional question can be decided.'" Williams v.

Lambert, 46 F.3d 1275, 1281 (2d Cir. 1995) (citing Hawaii Hous. Auth. v. Midkiff, 467 U.S.

229, 236, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984)).  According to the Second Circuit, "[t]hree basic conditions must be present to trigger <u>Pullman</u> abstention: 'First, the state statute must be unclear or the issue of state law uncertain; second, resolution of the federal issue must depend upon the interpretation given to the ambiguous state provision; and third, the state law must be susceptible of an interpretation that would avoid or modify the federal constitutional issue.'" <u>Id.</u> (citing <u>United Fence & Guard Rail Corp. v. Cuomo</u>, 878 F.2d 588, 594 (2d Cir. 1989)).

The Defendants assert that the causes of action set forth by the Plaintiff clearly fit the <u>Pullman</u> abstention doctrine.  In particular, they argue that the Plaintiff has acknowledged that there is an ambiguity with regard to the public versus private entity status of the SPCA, which is currently at issue in the pending Article 78 proceeding.  Furthermore, the Defendants contend that the resolution of this issue in the Article 78 proceeding is "completely intertwined" with the issues pending in this case, namely (1) whether the law conferring peace officer powers to SPCA volunteers is unconstitutional; and (2) whether the SPCA is a "state actor", which is a prerequisite to award Section 1983 damages.  The Plaintiff asserts that the <u>Pullman</u> doctrine also does not apply because there is no allegation that a state statute is either ambiguous or unsettled.

The Court must first ask whether the Defendants have identified any unclear provisions of state law whose interpretation would avoid or modify the constitutional issues presented. Here, the Defendants do not contend that the state statute, or the regulations implementing it, is ambiguous.  "'[W]here a state statute is unambiguous the court must perform its adjudicative duty and has no right to abstain merely because a state court decision might render a federal adjudication unnecessary.'" <u>Alliance of Am. Insurers v. Cuomo</u>, 854 F.2d 591, 602 (2d Cir. 1988) (quoting <u>McRedmond v. Wilson</u>, 533 F.2d 757, 761–62 (2d Cir. 1976)).  The Plaintiff has initiated an Article 78 proceeding to discern whether the SCPA is a public entity for purposes of

the FOIL statute. However, there is no particular state statute that is unclear or uncertain. Further, even if there was, the Plaintiff is correct in pointing out that this would have no bearing on the Section 1983 cause of action. For this reason, the Defendants' motion to dismiss the present case on the ground of the <u>Pullman</u> abstention doctrine is denied.

### 3. <u>Younger</u> Abstention

"The <u>Younger</u> abstention rule refers to the principle of federalism that 'a federal court may not enjoin a pending state criminal proceeding in the absence of special circumstances suggesting bad faith, harassment or irreparable injury that is both serious and immediate.'" <u>Pathways, Inc. v. Dunne</u>, 329 F.3d 108, 113–14 (2d Cir. 2003) (quoting <u>Kirschner v. Klemons</u>, 225 F.3d 227, 233 (2d Cir. 2000)). The principles enunciated in <u>Younger</u> have been expanded to civil proceedings. <u>See Huffman v. Pursue, Ltd.</u>, 420 U.S. 592, 594, 95 S. Ct. 1200, 43 L. Ed. 2d 482 (1975); <u>see also Moore v. Sims</u>, 442 U.S. 415, 423, 99 S. Ct. 2371, 2377, 60 L. Ed. 2d 994 (1979) ("the basic concern—that threat to our federal system posed by displacement of state courts by those of the National Government—is also fully applicable to civil proceedings in which important state interests are involved."). In <u>Middlesex County Ethics Committee v. Garden State Bar Association</u>, the Supreme Court stated that "[t]he policies underlying <u>Younger</u> are fully applicable to noncriminal judicial proceedings when important state interests are involved." 457 U.S. 423, 432, 102 S. Ct. 2515, 2521, 73 L. Ed. 2d 116 (1982) (citing <u>Moore</u>, 442 U.S. at 423, 99 S. Ct. at 2377).

Notably, in the "interests of comity and federalism," the <u>Younger</u> abstention doctrine requires federal courts to abstain from jurisdiction "whenever federal claims have been or could be presented in ongoing state judicial proceedings that concern important state interests." <u>Hawaii Hous. Auth. v. Midkiff</u>, 467 U.S. 229, 237–38, 104 S. Ct. 2321, 81 L. Ed. 2d 186 (1984).

Accordingly, Younger abstention "does not apply when a plaintiff's federal claims cannot be presented in pending state proceedings." Tellock v. Davis, No. 02 Civ. 4311, 2002 WL 31433589, at *4 (E.D.N.Y. Oct. 31, 2002) (citing Kirschner, 225 F.3d at 233).

Younger is not based upon an Article III requirement, but instead is a "prudential limitation on the court's exercise of jurisdiction grounded in equitable considerations of comity." Spargo v. New York State Com'n on Judicial Conduct, 351 F.3d 65, 74 (2d Cir. 2003); see Benavidez v. Eu, 34 F.3d 825, 829 (9th Cir. 1994) ("Younger abstention is not jurisdictional, but reflects a court's prudential decision not to exercise jurisdiction which it in fact possesses.") (emphasis omitted); Schachter v. Whalen, 581 F.2d 35, 36 n.1 (2d Cir. 1978) (per curiam) ("Younger abstention goes to the exercise of equity jurisdiction, not to the jurisdiction of the federal district court as such to hear the case."). The rationale behind Younger was set forth by the Second Circuit in Spargo v. New York State Com'n on Judicial Conduct:

> "Our Federalism" in its ideal form, as the Supreme Court explained in Younger, strives towards a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States. In recognition of this balance of interests, Younger generally prohibits courts from taking jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings so as to avoid unnecessary friction. Giving states the first opportunity . . . to correct their own mistakes when there is an ongoing state proceeding serves the vital purpose of reaffirm[ing] "the competence of the state courts" and acknowledging the dignity of states as co-equal sovereigns in our federal system.

351 F.3d at 75 (internal quotations and citations omitted).

With this doctrinal framework in mind, the Second Circuit has instructed that "Younger abstention is mandatory when: (1) there is a pending state proceeding, (2) that implicates an

important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims". Id.

The Defendants do not make any specific arguments regarding the Younger doctrine and its applicability here. Rather, they merely mention it in passing. The Plaintiff's position is that Younger only applies when a party is asking a court to enjoin or stay a state court action. While the Plaintiff's position is not correct, the Younger abstention doctrine is nonetheless inapplicable because the parallel state proceeding at issue here is remedial, not coercive.

"In the paradigm situation calling for Younger restraint, the state defendant brings a federal action challenging the statute [which is simultaneously being applied against him]." Fernández v. Trías Monge, 586 F.2d 848, 851 (1st Cir. 1978); see, e.g., Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 107 S. Ct. 1519, 95 L. Ed. 2d 1 (1987) (federal plaintiff seeking to enjoin state plaintiff from enforcing judgment against him); Moore v. Sims, 442 U.S. 415, 99 S. Ct. 2371, 60 L. Ed. 2d 994 (1979) (federal plaintiffs seeking to enjoin state proceedings against them for child abuse). As noted by the Sixth Circuit, "Younger cases generally have a common procedural posture". Devlin v. Kalm, 594 F.3d 893 (6th Cir. 2010).

> In the typical Younger case, the federal plaintiff is a defendant in ongoing or threatened state court proceedings seeking to enjoin continuation of those state proceedings. Moreover, the basis for the federal relief claimed is generally available to the would-be federal plaintiff as a defense in the state proceedings.

Crawley v. Hamilton County Comm'rs, 744 F.2d 28, 30 (6th Cir. 1984).

This is not the situation presented by the case at bar. Rather, the parallel state and federal civil actions were initiated by the same private party. Consequently, the Court faces the thorny issue of whether this is the type of case that warrants abstention under Younger. In particular, the Court must determine whether the state proceeding is "the type of proceeding to which Younger applies," New Orleans Pub. Serv., Inc. v. Council of City of New Orleans, 491 U.S.

350, 367, 109 S. Ct. 2506, 105 L. Ed. 2d 298 (1989), which normally means "state criminal

prosecutions" or "civil enforcement proceedings," id. at 368, 109 S. Ct. 2506.

In the Younger context, a number of federal courts, as well as legal commentators, have

focused on the distinction between state remedial actions and coercive actions. The dichotomy

largely stems from a footnote found in the Supreme Court case of Ohio Civil Rights Commission

v. Dayton Christian Schools, 477 U.S. 619, 106 S. Ct. 2718, 91 L. Ed. 2d 512 (1986), which

stated that:

> The lower courts have been virtually uniform in holding that the Younger
> principle applies to pending state administrative proceedings in which an
> important state interest is involved....
>
> The application of the Younger principle to pending state administrative
> proceedings is fully consistent with Patsy [ v. Board of Regents of the State of
> Florida, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982) ], which holds that
> litigants need not exhaust their administrative remedies prior to bringing a § 1983
> suit in federal court. Unlike Patsy, the administrative proceedings here are
> coercive rather than remedial, began before any substantial advancement in the
> federal action took place, and involve an important state interest.

Id., 477 U.S. at 627 n.2, 106 S. Ct. at 2723. Thus, based upon this language, "some courts [in

determining whether to abstain,] evaluate whether the federal plaintiff is involved in a 'coercive'

state proceeding, in other words a state-initiated enforcement action in which the plaintiff does

not have a choice to participate, or a 'remedial' proceeding in which the plaintiff initiated an

option to seek a remedy for the state's wrongful action."  Eric Turner, Comment, You Say

Remedial, I Say Coercive, Let's Call the Whole Thing Off: Why the Remedial/Coercive

Distinction Is Not Critical in Younger Abstention, 49 Washburn L.J. 629, 641 (2010).  One

district court case from the Third Circuit has defined the dichotomy between remedial and

coercive proceedings as follows: "In remedial state proceedings, the plaintiff is attempting in

both state and federal courts to vindicate a wrong inflicted by the state; in coercive state

proceedings, the federal plaintiff is the state court defendant, and the state proceedings were initiated to enforce a state law." Remed Recovery Care Ctrs. v. Twp. of Worcester, No. 98 Civ. 1799, 1998 WL 437272, at *3 (E.D. Pa. July 30, 1998) (citations omitted).

The circuits are not uniform in their application of the remedial/coercive distinction in the abstention context. As one commentator has noted, circuits disagree not only about whether the coercive-remedial distinction matters, but also how to tell the difference. Turner, supra, at 641. Nevertheless, many circuits that have addressed the issue have found the distinction to be a crucial one, especially when the remedial nature of the state court proceeding is apparent.

The Second Circuit has not expressly ruled on this issue, but any inferences drawn from its opinions appear to indicate that the distinction is one that is valid. Compare Bethphage Lutheran Serv., Inc. v. Weicker, 965 F.2d 1239 n.2 (2d Cir. 1992) ("Moreover, under Younger . . . and its progeny, abstention is appropriate to avoid federal court interference with pending state "coercive" proceedings.") with Univ. Club v. City of N.Y., 842 F.2d 37, 42 (2d Cir. 1988) ("Union League contends that because the commission's proceedings are civil rather than criminal, they are 'remedial' rather than 'coercive'. This argument has no merit . . . We have little difficulty concluding that the commission proceedings here are coercive in nature; indeed, that is precisely what Union League is concerned about."). Moreover, at least one district court in this Circuit has explicitly embraced it. See, e.g., OMYA, Inc. v. Vermont, 80 F. Supp. 2d 211, 215 (D. Vt. 2000). In OMYA, the District Court of Vermont highlighted that "the Younger line of cases uniformly involves state actions brought by the state against the federal plaintiff." Id. at 215. The OMYA court went on to note that a "notably different procedural posture" presented itself in that case:

Here, OMYA has brought suit in state court challenging the legality of the permit restrictions placed on it by the Environmental Board. Defendants have admitted

that there is no pending threat of prosecution or enforcement in this case. The Younger line of cases is solely concerned with preventing Defendants in state court from circumventing state prosecution or enforcement by way of federal judicial intervention.

Id. at 216. Thus, the Court "declined to extend Younger to cases that involve proceedings in state court which were initiated by the federal Plaintiff." Id. But see Liberty Mut. Ins. Co. v. Hurlbut, No. 08 Civ. 7192, 2009 WL 604430, at *4 (S.D.N.Y. March 9, 2009) ("In addition, the fact that the proceedings are between private parties does not preclude abstention, as the state has an interest here that goes beyond its interest as adjudicator of wholly private disputes.") (internal quotation and citation omitted).

Certainly, this distinction is one that has been criticized. See Turner, supra ("Whether a proceeding is remedial or coercive should not be an all or-nothing, either-or question but rather one of degree relevant for measuring the state's interest. . . . Proceedings necessary for the vindication of important state policies encompass remedial proceedings in which the state defends its policies against allegations of wrongdoing"); Taylor G. Selim, Note, Remedial and Coercive Administrative Proceedings Under Younger: The Tenth Circuit's Test in Brown v. Day, 2010 BYU L. Rev. 267 (2010). In addition, the fact that not every Circuit is in line with this thinking is an important consideration. Compare Alleghany Corp. v. Haase, 896 F.2d 1046, 1053 (7th Cir. 1990) (finding the distinction matters in a decision to hear the federal suit), and Gordon v. E. Goshen Twp., 592 F. Supp. 2d 828, 842 (E.D. Pa. 2009) (declining to apply Younger abstention on the ground that plaintiffs' state case was a remedial action in a case involving residents seeking an injunction to stop an ordinance from allowing deer hunting with a bow in township) with Alleghany Corp. v. McCartney, 896 F.2d 1138, 1145 (8th Cir. 1990) (finding distinction does not matter in decision to abstain).

Nonetheless, whether looking at the initiating party or the underlying nature and substance of the proceedings, the state court actions here are clearly remedial. See Brown v. Day, 555 F.3d 882, 896 (10 Cir. 2009) (Tymokovich, J., dissenting) ("By making the distinction turn on the underlying nature and substance of the administrative proceedings, we can ensure Younger abstention applies only to proceedings—like criminal prosecutions—of paramount importance to the state."). The Court finds that these are not the type of parallel state court proceedings for which a federal court must abstain under Younger. See Devlin, 594 F.3d at 895 ("Accordingly, Younger does not prevent the federal court from ruling on Devlin's claims in the present suit because Devlin is the plaintiff in both the federal and state proceedings, and Devlin does not seek to enjoin the state proceedings or otherwise use the federal court to shield him from state enforcement efforts."). "The jurisdictional sword that sustains federal rights should not be swiftly sheathed simply because a concurrent parallel attack has been mounted in the state courts." United Fence & Guard Rail Corp. v. Cuomo, 878 F.2d 588, 595 (2d Cir. 1989).

Therefore, because the state court actions initiated by Kanciper are remedial, the Court finds that Younger abstention is not applicable to the instant case. Accordingly, the Defendants' motion to dismiss on this ground is denied.

## C. Claim Splitting

Finally, the Defendants argue that because the same nexus of facts forms the basis of the Suffolk State Court Action and the instant action, and thus there are two concurrently pending lawsuits in two jurisdictions based on identical underlying facts under differing theories of liability, this constitutes impermissible claim splitting so that this case must be dismissed.

### 1. The Relevant Legal Principles

The Supreme Court has stated that principles "of *res judicata* and collateral estoppel caution the civil plaintiff against splitting his case." Ashe v. Swenson, 397 U.S. 436, 456, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970) (Brennan, J. concurring). This is because it is a "well-established rule that a plaintiff cannot avoid the effects of *res judicata* by 'splitting' his claim into various suits, based on different legal theories." Waldman v. Vill. of Kiryas Joel, 207 F.3d 105, 110 (2d Cir. 2000); see Am. Stock Exchange v. Mopex, Inc., 215 F.R.D. 87, 91 (S.D.N.Y. 2002) ("It is well established, under the doctrine of 'claim splitting,' that a party cannot avoid the effects of *res judicata* by splitting her cause of action into separate grounds of recovery and then raising the separate grounds in successive lawsuits. Rather, a party must bring in one action all legal theories arising out of the same transaction or series of transactions.") (citations omitted). "The penalty for violation of this rule is that the adjudication reached on the first action is, under the doctrine of *res judicata*, a bar to the maintenance of the second one. Not only is a second suit barred, but also the plaintiff in the first action cannot subsequently seek to benefit from the residue of his or her claim by way of offset in an action against him or her by the opposite party." 1 Am. Jur. 2d Actions § 103.

There is no question that district courts have discretion to control their dockets by dismissing duplicative cases. See Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236, 47 L. Ed. 2d 483 (1976) ("As between federal district courts . . . though no precise rule has evolved, the general principle is to avoid duplicative litigation."); Ritchie v. Landau, 475 F.2d 151, 156 (2d Cir. 1973) ("Courts should not permit splitting of causes of action when the result of doing so could result in vexatious litigation for the defendant and an undue clogging of the dockets of the court."); see also Elgin v. Dep't of Treasury, -- U.S.

---, 132 S. Ct. 2126, 2135 (2012) ("a tribunal generally has discretion to decide whether to dismiss a suit when a similar suit is pending elsewhere." (citing 18 C. Wright et al., Federal Practice and Procedure § 4406 (2d ed. 2002 and Supp. 2011)).

In 1894, the Supreme Court explained the notion of claim-splitting as follows:

> When the pendency of a [previously filed] suit is set up to defeat another, the case must be the same. There must be the same parties, or, at least, such as represent the same interests; there must be the same rights asserted and the same relief prayed for; the relief must be founded upon the same facts, and the title, or essential basis, of the relief sought must be the same.

The Haytian Republic, 154 U.S. 118, 124, 14 S. Ct. 992, 38 L. Ed. 930 (1894) (quotation omitted); see Stone v. Dep't of Aviation, 453 F.3d 1271, 1278 (10th Cir. 2006) ("A plaintiff's obligation to bring all related claims together in the same action arises under the common law rule of claim preclusion prohibiting the splitting of actions."). As the Second Circuit has more recently stated in exploring the rationale underlying this doctrine, "[t]his rule against claim splitting is based on the belief that it is fairer to require a plaintiff to present in one action all of his theories of recovery relating to a transaction, and all of the evidence relating to those theories, than to permit him to prosecute overlapping or repetitive actions in different courts or at different times." AmBase Corp. v. City Investing Co. Liquidating Trust, 326 F.3d 63, 73 (2d Cir. 2003) (internal citation and quotation omitted).

In sum, "when two actions are pending which are based on the same claim, or which involve the same issue, it is the final judgment first rendered in one of the actions which becomes conclusive in the other action . . . , regardless of which action was first brought." Giragosian v. Ryan, 547 F.3d 59, 63 (1st Cir. 2008). On the other hand, claim splitting does "not invariably eliminate the possibility of simultaneous proceedings, for a tribunal generally has discretion to decide whether to dismiss a suit when a similar suit is pending elsewhere." Elgin, 132 S. Ct. at

2126 (citing 18 C. Wright et al., Federal Practice and Procedure § 4406 (2d ed. 2002 and Supp. 2011)).

"New York . . . embrace[s] this general prohibition against claim-splitting." In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liability Litig., 209 F.R.D. 323, 339 (S.D.N.Y. 2002); see Sannon-Stamm Assoc., Inc. v Keefe, Bruyette & Woods, Inc., 68 A.D.3d 678, 890 N.Y.S.2d 828 (1st Dep't 2009) ("The doctrine of *res judicata* may be invoked in instances of claim splitting to prohibit a plaintiff from bringing an action for only part of his claim; the judgment obtained in that action would preclude him from bringing a second action for the residue of the claim"); Pfeiffer v. Allstate Insurance Co., 136 A.D.2d 532, 523 N.Y.S.2d 152 (2d Dep't. 1988) ("With respect to a single matter, there should not be more than a single lawsuit so as to prevent harassing and vexatious litigation."). In particular, New York law follows § 61 of Restatement of Judgments, Second which provides:

> (1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (citations omitted), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

> (2) What factual grouping constitutes a 'transaction', and what groupings constitute a 'series', [sic] are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a trial unit conforms to the parties' expectations or business understanding or usage.

Reilly v. Reed, 45 N.Y.2d 24, 407 N.Y.S.2d 645, 379 N.E.2d 172, 176 (1978) (quoting Restatement of Judgments, Second (Tent. Draft No. 1, 1973), § 61, Dimensions of 'Claim' for

Purposes of Merger or Bar General Rule Concerning 'Splitting'); see also Chase v. Scalici, 97 A.D.2d 25, 468 N.Y.S.2d 365 (2d Dep't 1983).

The first major concern that the Court must address is that the state action at issue is still pending. Thus, there is no final judgment yet in order to warrant traditional concerns of *res judicata*. In this regard, the Plaintiff points out that there can be no claim splitting as long as there is no final judgment in the other case.

Nevertheless, as the Tenth Circuit has previously determined, the Court now finds that "[w]hile it is correct that a final judgment is necessary for traditional claim preclusion analysis, it is not required for the purposes of claim splitting." Katz v. Gerardi, 655 F.3d 1212, 1218 (10th Cir. 2011) ("While we analyze claim splitting as an aspect of *res judicata*, the claim-splitting doctrine does not fall within a conventional *res judicata* analysis."); see Curtis, 226 F.3d at 138 ("The rule against duplicative litigation is distinct from but related to the doctrine of claim preclusion or *res judicata*."). Claim splitting focuses on a district court's "comprehensive management of its docket", as opposed to *res judicata*, which focuses on "protecting the finality of judgments." Katz, 655 F.3d at 1218.

Therefore, contrary to the Plaintiff's reasoning that claim-splitting is inapplicable here where there is no final judgment in the Suffolk County Action or the Article 78 proceeding, "in the claim-splitting context, the appropriate inquiry is whether, *assuming that the first suit were already final*, the second suit could be precluded pursuant to claim preclusion." Hartsel Springs Ranch of Colorado, Inc. v. Bluegreen Corp., 296 F.3d 982, 987 n.1 (10th Cir. 2002) (emphasis added); see Salib v. I.C. System, Inc., No. 01 Civ. 1083, 2002 WL 31060368, at *2 (D. Conn. July 24, 2002) ("A dispositive motion based on improper claim-splitting 'need not—indeed,

often cannot—wait until the first suit reaches final judgment.'" (quoting Hartsel, 2002 WL 1554456 at *3, n. 1).

Although it does not appear that the Second Circuit has expressly embraced this notion, the Court finds the Tenth Circuit's analysis in Katz to be persuasive. Specifically, this rule makes sense, "given that the claim-splitting rule exists to allow district courts to manage their docket and dispense with duplicative litigation. If the party challenging a second suit on the basis of claim splitting had to wait until the first suit was final, the rule would be meaningless. The second, duplicative suit would forge ahead until the first suit became final, all the while wasting judicial resources." See Katz, 655 F.3d at 1218–1219 ("Our precedent cannot be clearer: the test for claim splitting is not whether there is finality of judgment, but whether the first suit, assuming it were final, would preclude the second suit."); see also Brady v. UBS Fin. Svc., Inc., 538 F.3d 1319, 1327 n.10 (10th Cir. 2008) ("The first suit need not reach final judgment before a motion to dismiss based on improper claim-splitting can be granted.").

Consequently, the Court will proceed to assess whether if the Court assumes the finality of the Suffolk County Action and the Article 78 proceeding, whether duplicative claims have been asserted here so that res judicata would apply. See, e.g., Am. Stock Exchange, LLC v. Mopex, Inc., 215 F.R.D. 87 (S.D.N.Y. 2002); Bull & Bear Group, Inc. v. Fuller, 786 F. Supp. 388 (S.D.N.Y. 1992). In order to do so, the Court looks to whether a New York State court would give preclusive effect to a hypothetical judgment in the Suffolk County Action. See Allen, 449 U.S. at 96, 101 S. Ct. 411 (noting that under 28 U.S.C. § 1738, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so.").

### 2. As to Res Judicata

Under New York law, courts utilize a transactional approach to *res judicata*, which prevents parties to the prior action or those in privity with them "from raising in a subsequent proceeding any claim they could have raised in the prior one, where all of the claims arise from the same underlying transaction." Schulz v. Williams, 44 F.3d 48, 53 (2d Cir. 1994) (citing Reilly v. Reed, 45 N.Y.2d 24, 407 N.Y.S.2d 645, 379 N.E.2d 172, 176 (1978)).  In New York "[i]t is blackletter law that a valid final judgment bars future actions between the same parties on the 'same cause of action.'" Id. at 174 (quoting 50 C.J.S. Judgments § 598).  "'Once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.'" Yoon v. Fordham Univ. Faculty and Admin. Retirement Plan, 263 F.3d 196, 200 (2d Cir. 2001) (quoting O'Brien v. City of Syracuse, 54 N.Y.2d 353, 445 N.Y.S.2d 687, 429 N.E.2d 1158, 1159 (1981)); see Reilly at 175 (mandating that application of the *res judicata* doctrine is appropriate "when the two causes of action have such a measure of identity that a different judgment in the second [action] would destroy or impair rights or interests established by the first [action].") (quoting Schuylkill Fuel Corp. v. Nieberg Realty Corp., 250 N.Y. 304, 165 N.E. 456, 457 (1929) (Cardozo, C.J.)).  However, "a later claim arising from the same nucleus of facts as a previously adjudicated claim is not barred if the initial forum lacked the power to grant the full measure of relief sought in the later litigation." Pack v. Artuz, 348 F. Supp. 2d 63, 69 (S.D.N.Y. 2004). New York courts have held that *res judicata* principles are not to be applied "mechanically;" rather "the analysis requires consideration of the 'realities of the litigation.'" Nat'l Fuel Gas Distribution Corp. v. TGX Corp., 950 F.2d 829, 839 (2d Cir. 1991) (quoting Staatsburg Water

Co. v. Staatsburg Fire Dist., 72 N.Y.2d 147, 527 N.E.2d 754, 531 N.Y.S.2d 876 (1988) (quotations omitted)).

There are three factors relevant to the "same transaction" inquiry: (1) "whether the underlying facts are related in time, space, origin, or motivation[;]" (2) "whether they form a convenient trial unit[;]" and (3) "whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." Pike v. Freeman, 266 F.3d 78, 91 (2d Cir. 2001) (internal quotation marks and citation omitted).

Here, the Plaintiff urges this Court to focus not on general *res judicata* principles, but on its limitations. According to the Plaintiff, *res judicata* does not apply in § 1983 suits with respect to claims that could have been but were not raised in the prior state suit. Here, the Plaintiff points to a decision from a district court in the Southern District of New York from 1978, where it stated that"[t]his exception to the *res judicata* doctrine in civil rights suits is based in part on the policy that § 1983 relief was intended to be supplemental to state relief and that plaintiffs should be able to utilize both federal and state forums when one cause of action gives rise to state and federal claims. . . . Similarly, to effectuate this policy, civil rights plaintiffs are not required to exhaust their state judicial remedies." Williams v. Sclafani, 444 F. Supp. 906, 915 (S.D.N.Y. 1978) (citing Lombard v. Board of Education, 502 F.2d 631 (2d Cir. 1974), cert. denied, 420 U.S. 976, 95 S. Ct. 1400, 43 L. Ed. 2d 656 (1975); Newman v. Board of Education, 508 F.2d 277 (2d Cir.) (per curiam), cert. denied, 420 U.S. 1004, 95 S. Ct. 1447, 43 L. Ed. 2d 762 (1975); Morpurgo v. Board of Higher Education, 423 F. Supp. 704, 710 (S.D.N.Y. 1976)).

However, this blanket exception does not appear to represent the current or accurate state of the law. It seems to have been modified by the Supreme Court decision in Migra v. Warren City School Dist. Bd. of Educ., 465 U.S. 75, 84, 104 S. Ct. 892, 898 (1984), where the Court

stated that "we must reject the view that § 1983 prevents the judgment in petitioner's state-court proceeding from creating a claim preclusion bar in this case." Indeed, as recently as 2007, the Second Circuit stated that "a state court judgment will have a preclusive effect on a subsequently filed § 1983 action where the § 1983 claims could have been raised in the state court action." Dyno v. Village of Johnson City, 240 Fed. App'x 432, 434 (2d Cir. 2007); see generally, Martin A. Schwartz & Kathryn R. Urbonya, Section 1983 Litigation 165 (2d ed. 2008) ("[u]nder the full-faith and credit statute, 28 U.S.C. § 1738, federal courts in § 1983 actions must give state court judgments the same preclusive effect they would receive in state court under state law") (citing Migra v. Warren City Sch. Dist., 465 U.S. 75, 81, 104 S. Ct. 892, 79 L.Ed.2d 56 (1984)); see also Coolidge v. Coates, No. 06 Civ. 92, 2006 WL 3761599, at *3 (D. Vt. Nov. 20, 2006) ("The doctrine of res judicata bars parties from litigating in a subsequent action issues that were or could have been litigated in an earlier proceeding, . . . and applies equally to constitutional claims arising under § 1983 which could have been argued in an earlier state court proceeding.").

Here, the Court finds that the Plaintiff's Section 1983 claims against the SPCA, Gross, and Norkelun should be dismissed under the principle of claim splitting, on the basis that these claims would be barred by res judicata if the Suffolk County Action were to reach a final judgment. The requirement that the "the previous action involve[s the party against whom res judicata is invoked] or its privy" is met. Kanciper is one of the plaintiffs in the state action and the SCPA, Gross, and Norklun are defendants. Second, the claims involved could be raised in the state action. "State courts as well as federal courts have jurisdiction over § 1983 cases." Howlett v. Rose, 496 U.S. 356, 358, 110 S. Ct. 2430, 2433, 110 L.Ed.2d 332 (1990). Finally, both the state court litigation and this case arise from the same transaction or series of events: the SPCA's and its agents' actions with regard to the execution of a search warrant on Kanciper's

property and her subsequent arrest. Thus, the issues presently before the Court arise out of the same factual grouping as the issues to be adjudicated in state court. The allegations here are "co-terminus as to time, space, origin and effect, [and] many of the critical supporting allegations are identical." John Street Leasehold, LLC v. Capital Management Resources, 154 F. Supp. 2d 527 (S.D.N.Y. 2001). In addition, Kanciper's claims in both actions would be a convenient trial unit because the witnesses and the evidence in both cases would be substantially the same.

While certainly the Plaintiff here is asserting a different legal theory, Section 1983, that is of no matter. Under the doctrine of *res judicata*, "a prior decision[,which the court assumes for purposes of claim splitting analysis,] is binding. . . in all subsequent litigation between the same parties on claims arising out of the same facts, *even if based upon different legal theories or seeking different relief on issues which were or might have been litigated in the prior action but were not*." N. Assur. Co. of Am. v. Square D. Co., 201 F.3d 84, 87 (2d Cir. 2000) (emphasis added), quoting EFCO Corp. v. U.W. Marx, Inc., 124 F.3d 394, 397 (2d Cir. 1997); see also Reilly, 45 N.Y.2d at 30 (holding that, "where the same foundation facts serve as a predicate for each proceeding, differences in legal theory and consequent remedy do not create a separate cause of action").

Therefore, because Kanciper could have presented her federal constitutional claims in the state court action, which are claims that arise out of the same transaction, the Section 1983 claims against these three defendants are dismissed without prejudice. See McPherson, 452 F. Supp. 2d 133, 140 (E.D.N.Y. 2006) (concluding that *res judicata* precluded a federal court action brought pursuant to 42 U.S.C. § 1983 challenging the constitutionality of a foreclosure, when the plaintiff had previously brought a state court action to challenge the judgment of foreclosure). Cf. Genger *ex rel.* AG Properties Co. v. Sharon, --- F. Supp. 2d ----, 2012 WL 5845553 ("That

both the state court action and Genger's current claim involved "essentially the same course of wrongful conduct"—Sharon's investment in AG Properties—does not preclude the current action. Because the Omniway Note involved a separate transaction than the one at issue in the state court action, Genger's current action does not constitute claim-splitting.").

With regard to the two remaining Defendants in this action that are not parties to the Suffolk County Action—Gerald Lauber and Shawn A. Dunn—the Court must determine if these parties are in privity with the other Defendants in order to find that the Section 1983 claims as against them are also precluded by claim splitting. Under New York law, privity "includes those who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and possibly co-parties to a prior action." Watts v. Swiss Bank Corp., 27 N.Y.2d 270, 277, 317 N.Y.S.2d 315, 265 N.E.2d 739 (1970). See Akhenaten v. Najee, LLC, 544 F. Supp. 2d 320, 328 (S.D.N.Y. 2008) ("'The doctrine of privity . . . is to be applied with flexibility. . . . [T]here is no bright line rule' as to whether privity exists for *res judicata* purposes. 'Rather, a finding of privity . . . depends on whether, under the circumstances, the interests of the [defendant] were adequately represented [in the earlier action].'" (quoting Amalgamated Sugar Co. v. NL Indus., Inc., 825 F.2d 634, 640 (2d Cir. 1987) (internal citations omitted) (alteration in original))).

In the Court's view, Lauber and Dunn are in sufficient privity with the SPCA and the defendants in the state action so that the Section 1983 claims against them are also barred by principles of *res judicata*. Any actions that were taken by these Defendants are only alleged to have been taken as within the scope of their duties as SCPA members and/or directors. See John Street Leasehold, LLC v. Capital Mgmt. Res., L.P., 283 F.3d 73, 75 (2d Cir. 2002); Argenti v. Appelle, 205 F.3d 1321, at *2 (2d Cir. 2000). As agents of the SPCA and acting solely in their

roles as Chief of Detectives or a detective for this organization, it can be safely said that their

interests were adequately represented by another vested with the authority of representation—the

organization itself—and hence would be bound by a judgment in the first action, even though

they were not formally parties to the litigation. See McCarroll. v. U.S. Fed. Bureau of Prisons,

No. 11 Civ. 934, 2012 WL 3940346, at *8 (D. Conn. Sept. 10, 2012) ("Here, the 'newly' added

BOP defendants Barbara Darrah, Matthew Ellis and Judy Nichols are ineluctably in privity with

the BOP and their co-employees Crystal Kindall, Deborah Schult and Steven Lucas who were

Defendants in the NDNY Action. Courts have long recognized that privity exists between

coemployees or employees and their employers for res judicata purposes."); Alaimo v. Gen.

Motors Corp., No. 07 Civ. 7624, 2008 WL 4695026, at *5 (S.D.N.Y. Oct. 20, 2008) (holding

that plaintiff could not avoid the bar of *res judicata* by adding a General Motors employee as a

new defendant in the current action where General Motors was a defendant in the prior state

action); Tibbetts v. Stempel, 354 F. Supp. 2d 137, 148 (D. Conn. 2005) ("Generally, an

employer-employee or agent-principle relationship will provide the necessary privity for claim

preclusion with respect to matters within the scope of the relationship, no matter which party is

first sued.") (quotation marks omitted). As such, the Section 1983 claims against Lauber and

Dunn are dismissed without prejudice.

However, the Plaintiff does not just bring a Section 1983 claim against the Defendants,

which the Court has now dismissed. She also brings a declaratory judgment action, seeking a

declaration that (1) New York Criminal Procedure Law §2.10(7) is unconstitutional, because it

unlawfully delegates to a private advocacy group police powers to investigate, search, seize and

arrest individual citizens of the United States in derogation of the Fourth and Fifth Amendments

as incorporated by the Fourteenth Amendment to the Constitution; and (2) New York State

violated Article IV, Section I, of the New York State Constitution and New York State Executive Law §§30 and 30 by conferring Peace Officer status on the SPCA without any governmental oversight or supervision. These declaratory judgment claims necessarily lead this Court to the Brillhart abstention doctrine.

The Brillhart abstention doctrine gives a district court broad discretion to determine "whether and when to entertain an action . . ., even when the suit otherwise satisfies subject matter jurisdictional prerequisites." Wilton v. Seven Falls Co., 515 U.S. 277, 115 S. Ct. 2137, 2140, 132 L. Ed. 2d 214 (1995). Under Brillhart, the question for a district court presented with a declaratory judgment suit, is "'whether the questions in controversy between the parties to the federal suit, and which are not foreclosed under the applicable substantive law, can better be settled in the proceeding pending in the state court.'" Id. (quoting Brillhart, 316 U.S. at 495, 62 S. Ct. at 1176). Brillhart did not exhaustively lay out all of the factors that a court should take into consideration when exercising its discretion to hear a declaratory judgment suit, but did provide some guidance. For example, in determining whether the claims before it "can better be settled" in the state proceedings, a district court should examine the scope of the parallel state litigation and the nature of the defenses available there. Brillhart, 316 U.S. at 495, 62 S. Ct. at 1176. A district court should also consider "whether the claims of all parties in interest can satisfactorily be adjudicated in that [state] proceeding, whether necessary parties have been joined, whether such parties are amenable to process in that proceeding, etc." Id. The Brillhart decision "indicated that, at least where another suit involving the same parties and presenting opportunity for ventilation of the same state law issues is pending in state court, a district court might be indulging in '[g]ratuitous interference,' if it permitted the federal declaratory action to

proceed." Wilton, 515 U.S. at 283, 115 S. Ct. at 2141 (quoting Brillhart, 316 U.S. at 495, 62 S. Ct. at 1176).

In the exercise of this Court's discretion, and yielding to considerations of practicality and wise judicial administration, the Court now declines to take jurisdiction over the remaining declaratory judgment action. As the Supreme Court has noted "[i]n the [federal] system, discretionary refusal to entertain the [declaratory judgment] action frequently occurs when the suit involves a state statute, such as the one here." Horton v. Liberty Mut. Ins. Co., 367 U.S. 348, 360, 81 S. Ct. 1570, 1577, 6 L. Ed. 2d 890 (1961). Cf. Perez v. Ledesma, 401 U.S. 82, 91 S. Ct. 674, 27 L. Ed. 2d 701 (1971) ("federal courts should not ordinarily intervene by way of either declaratory or injunctive relief in cases where a state court prosecution exists that began before the federal suit was filed, and the federal court plaintiff alleges only that the state statute being applied to him is unconstitutional.").

Although Brillhart and Wilton involved state law claims in contrast to the addition of a federal constitutional claim raised in the present case, "the Supreme Court in Wilton acknowledged that the boundaries of discretion may extend to cases that involve issues of federal law." Barker v. Ripley, 921 F. Supp. 1213, 1218 (D. Vt. 1996) ("This Court feels that considerations of wise judicial administration, deference to state judicial proceedings and avoidance of duplicative litigation indicate that this matter is better resolved in the pending state proceedings."). Further, while the federal constitutionality of a state statute is at stake, this is highly distinguishable from Youell v. Exxon Corp., 74 F.3d 373, 376 (2d Cir. 1996), where the Second Circuit ruled that whether maritime losses caused by an insured's recklessness are fortuitous— a novel issue of federal admiralty law— would not constitute "[g]ratuitous interference with the orderly and comprehensive disposition of [the] state court litigation" so that

<u>Brillhart</u> abstention was inappropriate. Certainly "a federal question of first impression must all but demand that the federal court hear the case." <u>Id</u>.. However, underlying the <u>Brillhart</u> decision was the Court's concern that it was being called upon to pronounce independently upon state law. "To do so," the Court held, "would be to disregard the limitations inherent in our appellate jurisdiction. It is not our function to find our way through a maze of [state] statutes and decisions. . . ." <u>Brillhart</u>, 316 U.S. at 497, 62 S. Ct. at 1176. That is precisely the situation here. In addition, it is reasonable to find that the claims before this Court can better be settled in the pending state proceeding, which would provide an adequate forum for the declarations that the Plaintiff seeks.

Therefore, the Court declines to exercise jurisdiction over the remaining declaratory judgment causes of action in the Plaintiff's complaint.

In light of the dismissal of the Plaintiff's Section 1983 claims against the Defendants on the basis of claim splitting and of the Plaintiff's declaratory judgment claims on the basis of <u>Brillhart</u> abstention, the Court now dismisses the Plaintiff's action in its entirety without prejudice. Thus, the Court need not address the Defendants' motion to dismiss for failure to state a claim. In addition, the Plaintiff's motion to amend is denied as moot.

### III. CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the Defendants' motion to dismiss the Plaintiff's Section 1983 causes of action on the ground of claim splitting is granted and these claims are dismissed without prejudice; and it is further

**ORDERED**, that the Plaintiff's causes of action for declaratory judgment are dismissed without prejudice on the ground of <u>Brillhart</u> abstention; and it is further

**ORDERED**, that the Plaintiff's motion to amend is denied as moot; and it is further

**ORDERED**, that the Plaintiff's action is dismissed in its entirety; and it is further

**ORDERED**, that the Clerk of the Court is directed to mark this case as closed.


**SO ORDERED.**
Dated: Central Islip, New York
February 23, 2013


_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge